UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MELISSA EFIRD<br><br>Plaintiff,<br><br>v.<br><br>ROCKINGHAM COUNTY SHERIFF SAMUEL SCOTT PAGE, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:24CV332 |

ORDER AND MEMORANDUM OPINION

This matter comes before the Court on a Motion for Summary Judgment [Doc. #67] filed by Defendant Joanna Peach, LPN ("Defendant Peach" or "Nurse Peach") and Defendant Southern Health Partners ("Defendant SHP" or "SHP") (collectively "Defendants"). This is a civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Melissa Efird, mother and personal representative of the Estate of Kyle Barrett Kepley, who died by suicide in May 2022 at the Rockingham County Detention Center ("RCDC"), where he was held as a pretrial detainee. For the reasons set out below, the Motion for Summary Judgment will be granted as to the § 1983 claims, and the Court will decline to exercise supplemental jurisdiction over the state law claims, so those claims will be dismissed without prejudice.[1] Defendant's Motion to Exclude and/or Strike Expert Testimony [Doc. #69] is related to the state law claims and therefore will be denied without prejudice.

[1] The Parties have consented to the referral of this case to a United States Magistrate Judge. (Joint Rule 26(f) Report [Doc. #36] at 5.)

## I. BACKGROUND

### A. Procedural History

Plaintiff filed the instant matter against nine defendants, including Rockingham County Sheriff Samuel Scott Page in his official capacity; four RCDC officers in their individual capacities; RCDC's contracted medical provider, SHP; and three medical providers employed by SHP, alleging violations of federal civil rights law and North Carolina law. Since the filing of the Amended Complaint, Plaintiff has settled and voluntarily dismissed her claims against the County and RCDC defendants, Sheriff Samuel S. Page, Officer Orin S. Stultz, Officer Reid James Boyd, Sr., Officer Mark Samuel Martin, Jr. and Captain Marcus Shane Bullins, and voluntarily dismissed her claims against two of three medical providers, Dr. Amos and Nurse Rivera, as well. The two remaining defendants are SHP and Nurse Peach.

Plaintiff asserts the following remaining claims: Deliberate Indifference to Medical Needs under 42 U.S.C. §§ 1983 and 1988 against Defendants Peach and SHP; Injury To Prisoner Under N.C.G.S. § 162-55 against Defendants SHP and Peach; Medical Malpractice Under N.C. Gen. Stat. § 90-21.12 against Defendants SHP and Peach; and Wrongful Death Pursuant to N.C.G.S. § 28-174 against Defendants SHP and Peach; and "Failure to Train & Supervise and Inadequate Staffing" against Defendant SHP.

### B. Factual Background

In her Amended Complaint, Plaintiff alleges that officers and medical personnel at RCDC knew that Kepley was at a substantial risk of suicide, including that Kepley was going through opiate withdrawal, made delusional and psychotic statements, expressed that he wanted to die, and that one of Kepley's friends called the Rockingham County Sherriff's Office

and told an employee there that Kepley struggled with his mental health and was suicidal, but that Defendants did not take action to reduce this risk and instead placed him in a cell alone, did not institute a Special Watch, and did not conduct rounds to check on him for over an hour after he said he wanted to die. (Am. Compl. [Doc. #9] ¶¶ 34-43.) Plaintiff further alleges that RCDC "had a history of multiple deaths associated with failure to comply with state law on observational rounds," including three recent suicides, and that it was the policy and practice of RCDC not to conduct mental health screenings and not to conduct required rounds. (Am. Compl. ¶¶ 47-48, 66-76.) Most of these claims are alleged against the RCDC staff, but those claims have settled, and the only remaining claims relate to Nurse Peach, who saw Mr. Kepley on May 1, 2022, the day he was booked into RCDC. The Court therefore sets out the facts generally, but ultimately focuses on the claims as to Nurse Peach.

On April 30, 2022, Mr. Kepley was arrested by the Reidsville Police Department for failing to appear for a prior hearing on several non-violent traffic offenses. (Am. Compl. ¶ 31.) In the early morning hours of May 1, 2022, Officer Mark Samuel Martin booked Mr. Kepley into the Rockingham County Detention Center and performed an Inmate Medical Screening ("Inmate Medical Screening"). (Medical Records [Doc. #68-4] at 27-29.) During the intake, Mr. Kepley told Officer Martin that he had a pacemaker. (Medical Records [Doc. #68-4] at 27-28.) Because Mr. Kepley reported having a pacemaker, his intake was considered "abnormal," indicating he needed to be evaluated by the nurse within twenty-four hours. (Peach Dep. [Doc. #74-1] at 59:17-60:13.) Officer Martin noted that Mr. Kepley did not appear to be under the influence of drugs or alcohol and was not showing visible signs of alcohol or drug withdrawal. (Medical Records [Doc. #68-4] at 27.) Officer Martin further

noted that Mr. Kepley had friends or relatives in Rockingham and that his incarceration would be an embarrassment to his family. (Medical Records [Doc. #68-4] at 27-28.) Officer Martin noted that Mr. Kepley did not "show signs of unconsciousness, obvious pain, bleeding, or other symptoms that suggest need for emergency treatment," that Mr. Kepley was not displaying "hostile behavior," that he did not "appear overly anxious or afraid," and that he was not "speaking strange or acting the strange behavior." (Medical Records [Doc. #68-4] at 27.) In response to the question whether "inmate's family members, arresting officer or anyone indicted that the inmate is a suicidal risk," Officer Martin noted "No". (Medical Records [Doc. #68-4] at 27.)

An inmate sick call slip indicates that on May 1, 2022, Mr. Kepley signed a form and reported as his "Complaint/Problem: Need to get the heart motion check", and stated that he had experienced this problem since the day before. (Medical Records [Doc. #68-4] at 32.) Around 1:20 p.m. on May 2, 2022, Mr. Kepley met with Nurse Peach. (Peach Dep. [Doc. #74-1] at 77:1-5; Medical Records [Doc. #68-4] at 2). The record reflects that Mr. Kepley was "seen due to having chest pain[;] stated has a pacemaker and someone's controlling it in his head. Explained not possible. H&P done. Put on detox for suboxone times three days." (Peach Dep. [Doc. #74-1] at 77:1-5; Medical Records [Doc. #68-4] at 2.) As part of this encounter, Nurse Peach performed a physical examination and determined that Mr. Kepley did not have a pacemaker. (Peach Dep. [Doc. #74-1] at 77:12-17.)

During this medical visit, Nurse Peach also completed multiple standard forms, including a History and Physical Form ("Physical Form"), and a Suicide Prevention Screening Guidelines Form ("Suicide Screening Form"). (Medical Records [Doc. #68-4] at 8-10, 26.)

On the Physical Form, Nurse Peach noted that Mr. Kepley's appearance was "appropriate," his affect was "appropriate", his thought was "organized," and he reported no prior suicide attempts, no current suicidal intentions, and no history of suicidal intentions. (Medical Records [Doc. #68-4] at 10.) He was alert and oriented with a normal physical exam. (Medical Records [Doc. #68-4] at 10.) However, Nurse Peach again noted that Mr. Kepley had chest pain and "states has a pacemaker" and "someone else has control of it" and "detox initiated." (Medical Records [Doc. #68-4] at 10.) On the Withdrawal Monitoring form, Nurse Peach indicated that Mr. Kepley exhibited weakness, was sweating, and was "very anxious," but Nurse Peach did not observe confusion or slurred speech. (Medical Records [Doc. #68-4] at 8.) Nurse Peach also noted that Mr. Kepley took Suboxone one to five times per day and drank four to five beers every other day. (Medical Records [Doc. #68-4] at 9.) Nurse Peach placed Mr. Kepley on opiate withdrawal monitoring and, pursuant to a standing order and medication protocol for withdrawal, Nurse Peach ordered 25 milligrams of Phenergan for nausea, two milligrams of loperamide for diarrhea, and 600 milligrams of ibuprofen. (Medical Records [Doc. #68-4] at 7; Peach Dep. [Doc. #74-1] at 72:3-14.)

Nurse Peach also completed a Suicide Screening Form with Mr. Kepley. The Suicide Screening Form provides that if a provider marks "yes" for eight or more questions, or marks "yes" to one or more shaded questions, the provider must "notify the Shift Commander and/or medical staff if onsite, IMMEDIATELY institute constant watch precautions." (Medical Records [Doc. #68-4] at 26.) (emphasis in original) Nurse Peach marked "yes" on two unshaded questions, indicating that Mr. Kepley had a history of drug or alcohol abuse, and "appear[ed] overly anxious, afraid, or angry" with a notation that he "has ADHD – last

took Adderall 2 days ago." (Medical Records [Doc. #68-4] at 26; Peach Dep. [Doc. #74-1] at 17.) At her deposition, Nurse Peach stated that she attributed his anxiety to his ADHD and not taking his medication for two days. (Peach Dep. [Doc. #74-1] at 62:20-63:14.) Nurse Peach did not mark an answer for the first two questions on the Suicide Screening Form, which were directed to "observations of transporting officers": whether the "arresting or transporting officer believes patient may be a suicide risk;" and whether the "[p]atient is unable to answer questions or refuses to do so," (Medical Records [Doc. #68-4] at 26), but as noted above, Officer Martin's intake form reflected that Mr. Kepley answered questions and was not displaying "hostile behavior," that he did not "appear overly anxious or afraid," that he was not "speaking strange or acting with strange behavior," and that there was no indication that Mr. Kepley's family members, arresting officer or anyone indicated that he was a suicide risk (Medical Records [Doc. #68-4] at 27-28.) While Nurse Peach did not check an answer box for Question three, whether the "patient lacks close family or friends in the community," she indicated in the comments that his mother resided in Reidsville. (Medical Records [Doc. #68-4] at 26.) Similarly, while Nurse Peach did not check an answer box for Question five, whether the "[p]atient is very worried about major problems other than legal situation," she indicated he was worried about "medical issues." (Medical Records [Doc. #68-4] at 26.)

In answers to the other screening questions, Nurse Peach noted that Mr. Kepley reported that he did not have psychiatric history, and had not previously attempted suicide or made a plan or attempt. (Medical Records [Doc. #68-4] at 26.) In response to whether Mr. Kepley was "thinking about killing him/herself," Nurse Peach noted that Mr. Kepley reported "No." (Medical Records [Doc. #68-4] at 26.) In response to whether he "feels there is nothing

to look forward to in the future (expresses feelings of helplessness or hopelessness, sense of doom, or has given up)", Mr. Kepley reported "No" and Nurse Peach noted that he indicated he had a job and was "getting back to normal life." (Medical Records [Doc. #68-4] at 26.) In her deposition, Nurse Peach noted that Mr. Kepley denied suicidal ideation multiple times and he stated he was "not feeling hopeless or helplessness" and was "looking forward to getting back to his normal life." (Peach Dep. [Doc. #74-1] at 98:19-99:1, 112:2-113:7.)

At issue in this case, Nurse Peach also marked "no" on item sixteen of the Suicide Screening Form, indicating that Mr. Kepley was not "acting and/or talking in a strange manner (ie cannot focus attention, hearing or seeing things which are not there, or is not making sense.)" (Medical Records [Doc. #68-4] at 26.) Question sixteen was a shaded question and thus required immediate suicide watch protocols to be implemented if answered affirmatively. (Medical Records [Doc. #68-4] at 26.) Plaintiff contends that in Nurse Peach's deposition, Nurse Peach admitted that "in hindsight," she "should have" marked "yes" on Question sixteen of the form, based on Mr. Kepley's statement about the pacemaker, and which, according to the form, would have resulted in Mr. Kepley being "on an immediate suicide watch." (Pl.'s Br. [Doc. #74] at 2; Peach Dep. [Doc. #74-1] at 101:4-14, 102:4-105:23.) In the deposition, Nurse Peach explained that she marked "no" because she "was looking at the whole picture of his treatment and his statements that he made." (Peach Dep. [Doc. #74-1] at 100:13-16.) Nurse Peach denied that Mr. Kepley exhibited psychosis, as "Mr. Kepley was able to answer all the other questions that were asked of him with no issues whatsoever . . . and the same with his behavior." (Peach Dep. [Doc. #74-1] at 79:21-81:6.) Nurse Peach testified that she met with Mr. Kepley for approximately twenty minutes, and based on her

observation and experience, did not believe Mr. Kepley needed to be placed on suicide watch or special watch precautions. (Peach Dep. [Doc. #74-1] at 84:20-85:1, 110:5-113:16.)

At the conclusion of this visit, Nurse Peach referred Mr. Kepley to SHP's mental health provider, Daymark. (Medical Records [Doc. #68-4] at 33.) However, Nurse Peach did not institute special watch protocols. (Peach Dep. [Doc. #74-1] at 104:10-12, 113:12-16.)[2]

Plaintiff alleges that Mr. Kepley had further interactions with various officers, including an alleged incident of excessive force. (Am. Compl. ¶ 35, 40-44.) At approximately 11:00 p.m. on May 2, 2022, Mr. Kepley was yelling, banging on his cell door, and pressing the call button for assistance. (Am. Compl. ¶ 41.) Mr. Kepley reportedly told a detention officer "he wanted to die." (Am. Compl. ¶ 43) Roughly two hours later, at approximately 12:50 a.m., on May 3, 2022, Mr. Kepley was found hanging from a sheet looped through a hole in his top bunk. (Am. Compl. ¶ 45, Rivera Dep. [Doc. #74-9] at 10:15-22.)

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standards

Summary judgment is appropriate when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[2] Nurse Peach also requested Plaintiff's medical records for recent emergency room visits, which were not received until later but which reflect that on April 29, 2022, the day before this arrest, Mr. Kepley sought treatment at Cone Health Hospital's Emergency Department. (Medical Records [Doc. #68-4] at 17-22.) Mr. Kepley reported that "he woke up with sharp pain in the center of his chest, then checked his pulse and did not feel it." (Medical Records [Doc. #68-4] at 18.) Mr. Kepley also stated that he believed his "heart stopped for about [three] minutes" but denied losing consciousness. (Medical Records [Doc. #68-4] at 18.) Mr. Kepley "denie[d] any suicidal or homicidal ideations" and "denie[d] any auditory or visual hallucinations." (Medical Records [Doc. #68-4] at 21.)

242, 248 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. at 255. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (noting that a non-moving party may not rest upon mere allegations or denials). Thus, "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive" a motion for summary judgment. Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 780 (4th Cir. 2023).

B. § 1983 Claims

1. Defendant Peach

Plaintiff asserts a claim under § 1983, contending that Defendant Peach was deliberately indifferent to Mr. Kepley's risk of suicide because she failed to implement suicide watch protocols. Although Plaintiff sets out this claim for relief under the Eighth and Fourteenth Amendments, Mr. Kepley was a pretrial detainee at the time of the events alleged, so the Court begins with the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment standard applicable to convicted prisoners. Short v. Hartman,

87 F.4th 593, 604-05 (4th Cir. 2023). "To state a claim for deliberate indifference to a medical need, the specific type of deliberate indifference claim at issue in this case, a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." Short, 87 F.4th at 611.[3]

A detainee's "'substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by the first prong' of the deliberate indifference test." Short, 87 F.4th at 612 (quoting Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001)); Buffington v. Baltimore Cnty., 913 F.2d 113, 120 (4th Cir. 1990). A plaintiff can establish deliberate indifference to this serious harm by showing that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

[3] Prior to the Fourth Circuit's opinion in Short v. Hartman, the standards for evaluating deliberate indifference claims under the Eighth Amendment for a convicted prisoner and under the Fourteenth Amendment for a pre-trial detainee were essentially the same. See Short, 87 F.4th at 607 ("At least with respect to deliberate indifference claims, we ha[d] consistently read this to mean that protections under the Fourteenth Amendment are the same as those under the Eighth Amendment and, consequently, should be evaluated under the same standard."); Brown v. Harris, 240 F.3d 383, 388-89 (4th Cir. 2001) (holding that a pretrial detainee is entitled to the protections of due process, but concluding that the court need not decide whether the prisoner was convicted or a pretrial detainee because the standard is the same). This meant that a plaintiff had to establish that defendants acted with subjective "deliberate indifference" to his objective "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). As the Fourth Circuit stated in Short, the entirely objective test now adopted for pretrial detainees differed from its prior subjective test in one respect only: a "plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. . . . Now, it is sufficient that the plaintiff show that the defendant's action or inaction was, in [the Supreme Court's] words, 'objectively unreasonable,' 576 U.S. at 397, 135 S. Ct. 2466: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." Short, 87 F.4th at 611.

Short, 87 F.4th at 611 (internal quotation omitted). However, a showing that a "defendant negligently or accidentally failed to do right by the detainee" is insufficient to raise a claim of deliberate indifference to a pre-trial detainee's medical condition. Id. at 611-12.

Notably, however, this analysis is different in evaluating whether the claim is barred by qualified immunity. Qualified immunity shields government officials from liability unless "the official violated a statutory or constitutional right" and "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A right is clearly established when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft, 563 U.S. at 741 (internal quotations and brackets omitted). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 743.

Here, because the underlying events in this case took place in 2022, before the Fourth Circuit's decision in Short, the Court considers the claim under the clearly established law prior to Short, which means that "qualified immunity turns on whether any reasonable official in the defendant's shoes would have understood that he was violating that objective and subjective standard" that was required to establish a constitutional violation for deliberate indifference at the time of the underlying events. Mays v. Sprinkle, 992 F.3d 295, 301-02 (4th Cir. 2021) (emphasis added) (internal quotation omitted). To satisfy the subjective standard, the plaintiff must show that the defendant subjectively knew of and disregarded an "objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotations omitted). This approach is consistent with

recklessness in the criminal law context, finding recklessness "only when a person disregards a risk of harm of which he is aware." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

"Without allegations that plausibly satisfy both the objective and subjective elements, [Defendants have] a right to dismissal based on qualified immunity." Mays, 992 F.3d at 302 ("Said another way, if the allegations show that the officers lacked the required subjective knowledge, then the officers would not have violated *clearly established* law. Only if the allegations plausibly show an objectively serious medical condition and subjective knowledge by the officers will Mays's claim clear the qualified-immunity hurdle."). Therefore, even if Plaintiff established that Nurse Peach failed to reasonably respond to an unjustifiably high risk of harm of which she should have known under the Short standard, to overcome qualified immunity for an incident prior to Short, Plaintiff must present evidence to establish that Nurse Peach subjectively knew of Mr. Kepley's serious medical needs or of the high risk of harm and still failed to act in conscious disregard of that risk. See id. In addition, the unconstitutionality of the failure must have been clearly established, such that every reasonable official would have understood that what she was doing violated Mr. Kepley's constitutional rights. Ashcroft, 563 U.S. at 741. As discussed below, Plaintiff has not put forth evidence that would show that Nurse Peach subjectively knew of Mr. Kepley's substantial risk of suicide and deliberately failed to intervene, or that Nurse Peach's actions violated clearly established rights, and Nurse Peach is therefore protected by qualified immunity.

Plaintiff argues that "[b]ased on Decedent Kepley's statements to Defendant Peach that he had a pacemaker which was being controlled by voices in his head, she knew he was delusional and may be experiencing psychosis." (Pl.'s Br. at 13.) As such, Plaintiff argues a jury could conclude that Defendant "Peach knew, or reasonably should have known, of a substantial risk of suicide (acute psychosis with delusions in a newly detained, anxious, withdrawing detainee)" but that Defendant Peach "failed to take readily available, basic precautions (suicide watch, special housing, removal of ligature points, urgent mental health evaluation) and left him in a cell where a ligature was available." (Id.) Plaintiff specifically points to Question sixteen of the Suicide Screening Form, where Defendant Peach indicated that Mr. Kepley was not "acting and/or talking in a strange manner." (Medical Records [Doc. #68-4] at 26.) As noted above, Question sixteen on the Suicide Screening Form was a shaded question and thus, if answered affirmatively, required suicide watch protocols to be implemented immediately. (Medical Records [Doc. #68-4] at 26.) Therefore, Plaintiff argues that Nurse Peach recognized that Mr. Kepley was experiencing psychosis yet was deliberately indifferent to Mr. Kepley's elevated risk of suicide because she failed to take appropriate preventive action.

However, this contention relies on what Nurse Peach "should have known" and "should have done," but qualified immunity here requires Plaintiff to present evidence that Nurse Peach actually knew of the serious risk of suicide, that is, that she was not only "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but also that she drew the inference. Although Nurse Peach admitted that in hindsight she "should have" marked "yes" on Question sixteen of the form, the evidence reflects that she

had an extended discussion with Mr. Kepley, who denied suicidal ideation multiple times and stated he was "looking forward to getting back to his normal life", and based on her observation and experience, she did not believe Mr. Kepley needed to be placed on suicide watch or special watch precautions, and instead placed him on opioid withdrawal monitoring and referred him for further mental health treatment with Daymark. Again, in assessing qualified immunity here, the Court does not consider whether Nurse Peach should have concluded otherwise, but rather whether Plaintiff has presented evidence that she actually knew that Mr. Kepley was a substantial suicide risk and failed to act in conscious disregard of that risk. See e.g., Hearn v. Lancaster Cnty., 566 F. App'x 231, 237 (4th Cir. 2014) (finding that despite writing a letter that could be interpreted as a suicide note, an inmate's "responses to [defendant]'s questions negate an inference that [defendant] must have known that Hearn was contemplating suicide."); Ward v. Holmes, No. 93-2209, No. 93-2210, 1994 WL 313624, at *5 (4th Cir. June 30, 1994) ("Holmes' failure to appreciate the significance of Ward's statement . . . as indicating suicidal tendencies on Ward's part was not evidence of deliberate indifference.") (unpublished table decision). Nurse Kepley's failure to identify a suicide risk, even if negligent, is not deliberate indifference under the subjective standard for qualified immunity here, as a "missed diagnosis, . . . does not automatically translate into deliberate indifference." Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) ("[G]eneral knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate."); Estelle, 429 U.S. at 106 (mere negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment" under the subjective test for

deliberate indifference, and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); Belcher v. Oliver, 898 F.2d 32, 35 (4th Cir. 1990) (discussing State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983), and noting that "knowledge that the prisoner was acting violently or freakishly was not 'synonymous with having reason to know that the violence might become self-directed'").

Although Nurse Peach did not initiate suicide watch procedures, she referred Mr. Kepley to Daymark, RCDC's mental health provider, and placed him on opioid withdrawal monitoring, consistent with her assessment. (Medical Records [Doc. #68-4] at 33.) See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("Though hindsight suggests that Lightsey's treatment decisions may have been mistaken, even gravely so, . . . Jackson's claim against Lightsey is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference." (internal brackets and quotations omitted)); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."); see also Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) ("Jackson's dispute with Defendants' decision not to authorize the particular treatment program he requested, and the subsequent course of monitoring he received, amounts to a disagreement with his course of treatment that is not cognizable" under the subjective test for deliberate indifference). While the result here was undoubtedly tragic, Nurse Peach's actions do not constitute deliberate indifference, using a subjective standard as required to overcome qualified immunity here, based on Plaintiff's contentions that Nurse Peach should have

assessed Mr. Kepley differently or chosen a different course. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference" under the subjective standard, and "it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Lightsey, 775 F.3d at 178; see also, e.g., Brown, 240 F.3d at 390 ("In the end, if we assume that Ogden was told that Brown was suicidal, he simply took less action than he could have, and by his own admission, should have. That does not, however, . . . mean that he acted with 'deliberate indifference.' At most, Ogden's failure to take additional precautions was negligent, and not deliberately indifferent.").

In summary, Nurse Peach's Motion for Summary Judgment on Plaintiff's § 1983 claim will be granted, because she did not know of and consciously disregard a serious risk of harm to Mr. Kepley, to overcome qualified immunity.

2. Defendant SHP

In her seventh claim for relief, Plaintiff asserts a claim for "Failure to Train & Supervise and Inadequate Staffing against Defendant SHP. Although not entirely clear, it is possible that this claim was intended, at least in part, to assert a separate § 1983 claim against SHP. Municipal liability under § 1983 applies to local government entities, including local government officials sued in their official capacity, when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). The Fourth Circuit Court of Appeals has held that the principles

of municipal liability under § 1983, as articulated in Monell and its progeny, apply to private corporations that employ special police officers, such that the private corporation is not subject to liability predicated solely upon a theory of *respondeat superior*. Austin v. Paramount Parks, Inc., 195 F.3d. 715, 727-28 (4th Cir. 1999) ("[A] private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights."); see also Conner v. Donnelly, 42 F.3d 220, 224 (4th Cir. 1994) (finding corporate providers of medical services in correctional facilities are considered to act under the color of law as "the provision of medical services to . . . inmates is traditionally the exclusive prerogative of the state."); West v. Atkins, 487 U.S. 42, 54-57 (1988); see also, e.g., Woodie v. McFadden, No. 3:21-cv-00068, 2022 WL 1213618 (W.D.N.C. April 25, 2022) ("The Monell standard also applies to private entities like Wellpath."); Ross v. Russell, No. 7:20-cv-000774, 2022 WL 767093 (W.D. Va. March 14, 2022) ("Although Wellpath is not a government entity, . . . it acts under color of state law in providing medical services to inmates pursuant to a contract, and it analyzes the claim against it as a Monell claim. Monell explains that local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (internal quotations omitted)). However, Plaintiff has not set out any basis for a Monell claim. Under Monell, four theories can be pursued to prove that an unlawful custom, policy, or practice violates § 1983: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s]

deliberate indifference to the rights of citizens"; or (4) through a practice so "persistent and widespread" as to constitute a "custom or usage with the force of law." Monell, 436 U.S. at 690-91. Plaintiff has not alleged any pattern or practice by SHP that led to a constitutional violation. In the briefing, Plaintiff asserts that Nurse Peach is a final policymaking official for SHP, but without any factual or legal authority for the contention that a line nurse at a local facility is the final policymaking official. (Pl.'s Br. at 9-10.) In addition, Plaintiff's factual contention is that Nurse Peach failed to properly follow SHP forms and guidance by failing to properly answer the Suicide Screening Form questions and failing to institute a required suicide watch. (Pl.'s Br. at 9.) There is no evidence of an express policy that caused the alleged constitutional violation, or a final decision of an actual policymaker, or a failure to train that is itself deliberate indifference, or a widespread practice that caused a constitutional violation. Plaintiff's basis for claims against SHP appears to be based on *respondeat superior* and related state law claims, which can be further considered if Plaintiff pursues the state law claims. Accordingly, the Court grants Defendant SHP's Motion for Summary Judgment as to Plaintiff's § 1983 Monell claim, but without prejudice to the pursuit of the related state law claims.

C. State Law Claims

Plaintiff also asserts state law claims against Nurse Peach and SHP, including medical malpractice, wrongful death, and punitive damages. Related to the state law claim, Defendants have moved to strike the testimony of Plaintiff's expert Barry J. Mills, M.D., Ph.D., arguing that he is not qualified to testify as to the standard of care that was applicable to Defendants Peach and SHP.

Jurisdiction was alleged in this case based on federal question jurisdiction in light of the § 1983 claims, with supplemental jurisdiction over the state claims under 28 U.S.C. § 1367. (Compl. [Doc. #1] ¶ 13-17; Am. Compl. ¶ 11, 13-17.) Having dismissed all of the federal claims, the Court may decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3). Under § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." Given the significant issues of state law remaining and the possibility of a trial on only state law claims, with significant state evidentiary issues, judicial efficiency and comity counsel in favor of declining to exercise supplemental jurisdiction in the absence of any federal claims. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Further, pursuant to North Carolina Rule of Civil Procedure 41, any claims that were timely asserted in the present case can be re-filed in state court within one year of this Order.

III. CONCLUSION

IT IS THEREFORE ORDERED that Defendants SHP and Peach's Motion for Summary Judgment [Doc. #67] is GRANTED as to Plaintiff's § 1983 claims.

IT IS FURTHER ORDERED that Plaintiff's remaining state law claims against Defendants SHP and Peach are dismissed without prejudice to Plaintiff pursuing the state law

claims in state court within one year of the date of this Order. As a result, Defendant's Motion to Strike and/or Exclude Expert Testimony [Doc. #69] is denied without prejudice.

This, the 30th day of September, 2026.

Joi Elizabeth Peake
United States Magistrate Judge